UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THE CONERLY CORPORATION, ET             CIVIL ACTION
AL.

VERSUS                                  NO: 08-813

REGIONS BANK, SUCCESSOR TO              SECTION: R(5)
AND AMSOUTH BANK AND BILL
CARROLL

## ORDER AND REASONS

Before the Court are defendants Regions Bank's and Bill

Carroll's Motion for Summary Judgment.  For the following

reasons, defendants' motion is DENIED.

## I.   BACKGROUND

### A.   The Beechgrove Redevelopment

In August 2002, plaintiff The Conerly Corporation ("Conerly

Corp.") entered into a construction contract with Beechgrove

Redevelopment Phase II, LLC ("Beechgrove") for renovation of

certain apartment units in Westwego, Louisiana.  To finance the

project, Beechgrove obtained a secured loan from AmSouth Bank,

predecessor to Regions Bank (collectively "AmSouth/Regions").[1]

The substance of this litigation concerns certain

representations allegedly made to Conerly Corp. by

_____

[1] Beechgrove also obtained financing from the U.S.
Department of Housing and Urban Development (HUD) and Jefferson
Parish.  These entities are not implicated in this litigation.

representatives of AmSouth/Regions.  According to plaintiffs, on several occasions Bill Carroll, an officer of AmSouth/Regions, threatened to replace Conerly Corp. if work was not completed faster.  Carroll also allegedly promised that all of the work done for Beechgrove that was approved by the architect would be paid in full.  Allegedly relying on Carroll's word that AmSouth/Regions would compensate further construction, Conerly Corp. continued to work and incur expenses.  Certain payments from Beechgrove and AmSouth/Regions were not forthcoming, however, and by September 2004 Conerly Corp. was required to seek financial assistance from its bonding company, the Insurance Company of Pennsylvania (ICSOP), in order to meet its obligations to subcontractors and continue work on the Beechgrove redevelopment.

**B.    The Bonding Agreements**

Two of the bonding agreements between Conerly Corp. and ICSOP are relevant to the present dispute.  First, in order to obtain a performance bond from ICSOP, Conerly Corp. entered into a General Indemnity Agreement dated May 4, 2001.  (*See* R. Doc. 60, Ex. B.)  The General Indemnity Agreement provides that Conerly Corp. will indemnify ICSOP for any losses or expenses resulting from ICSOP's execution of the bonds.  (*Id.* ¶ 2.)  The General Indemnity Agreement also provides that Conerly Corp.:

2

> will assign transfer and set over, and does hereby assign,
> transfer and set over to [ICSOP], as collateral, to secure
> the obligations in . . . this agreement and any other
> indebtedness and liabilities of [Conerly Corp.] to
> [ICSOP], . . . the assignment in the case of each contract
> to become effective as of the date of the bond covering such
> contract, but only in the event of (1) any . . . breach of
> any contracts referred to in the Bonds or of any breach of
> any said Bonds; . . . or (3) of a default in discharging
> such other indebtedness or liabilities when due . . . (a)
> all the rights of [Conerly Corp.] in, and growing in any
> manner out of, all contracts referred to in the Bonds, or
> in, or growing in any manner out of the Bonds; . . . (e)
> . . . any and all sums that may be due or hereinafter become
> due on account of any and all contracts referred to in the
> Bonds and all other contracts whether bonded or not in which
> the Contractor has an interest.

(*Id.* ¶ 3.)  The General Indemnity Agreement states that it "shall constitute a Security Agreement to [ICSOP] and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect." (*Id.* ¶ 5.)

Second, in order to obtain financial assistance from ICSOP in fall 2004, Conerly Corp. entered into a Financing Agreement dated October 12, 2004.  (R. Doc. 60, Ex. D.)  The terms of the Financing Agreement are in addition to (and not in lieu of) the terms of the General Indemnity Agreement as well as ICSOP's legal and equitable rights of indemnity and subrogation. (*Id.* ¶¶ 1, 9.)

The Financing Agreement acknowledges that Conerly Corp. would be financially unable to continue working on the Beechgrove redevelopment without financial assistance from ICSOP, and that

ICSOP had no obligation to supply such assistance to Conerly.

(*Id.* at 1; *id.* ¶¶ 2, 13.)  In consideration for ICSOP's

assistance, the Financing Agreement provides that Conerly Corp.:

> hereby assigns to [ICSOP] any and all claims arising out of
> the Project work, including but not limited to any and all
> claims against the Owner, the Project's architect, Conerly's
> subcontractors and/or suppliers and/or other subcontractors
> working on the Project.  This assignment includes the right
> to prosecute the claims in the name of the Conerly or
> [ICSOP], at [ICSOP]'s sole option, should Conerly fail or
> refuse to prosecute said claims.

(*Id.* ¶ 11.)  Moreover, Conerly Corp.:

> shall authorize and demand the Owner to pay the monies
> earned on the Project to [ICSOP], which Surety shall then
> use to offset and/or collateralize the debts owed or to be
> owed by Conerly to the Surety.  Surety shall have no
> obligation to return any monies it may receive from the
> Owner to Conerly unless and until all of the loss, cost,
> expense and fees, including attorney's fees, incurred by
> Surety are paid in full.

(*Id.* ¶ 10.)  The Financing Agreement additionally requires

Conerly Corp. to "provide full and complete cooperation to

[ICSOP] in any future litigation involving the Bonds and the

Project."  (*Id.* ¶ 15.)  Lastly, the Financing Agreement

contemplated the contemporaneous execution by Conerly Corp. of a

letter of voluntary default, a demand note for $7,172,514 and a

UCC-1 Financing Statement.  (*See* R. Doc. 60, Ex. D ¶¶ 3, 4)

## C.  Litigation

Despite ICSOP's financial assistance and Conerly Corp.'s

continuing work on the Beechgrove redevelopment, in March 2007

Carroll allegedly informed Conerly Corp. that it would receive no

further payments for work completed.  Conerly Corp., its
president Jessie Conerly, and ICSOP then brought this action for
damages against Carroll and AmSouth/Regions for breach of
contract, bad faith breach of contract, negligence and negligent
misrepresentation, unjust enrichment, detrimental reliance and
intentional misrepresentation.  The complaint alleges, *inter
alia*, that ICSOP is "a partial assignee of the rights owned by
The Conerly Corporation against defendants Bill Carroll and
AmSouth/Regions Bank."  (R. Doc. 39 ¶ 16.)  The Court granted in
part and denied in part the defendants' motions for summary
judgment on November 20, 2008.  (*See* R. Doc. 31.)  Among other
rulings, the Court dismissed all claims by Jessie Conerly.  (*See
id.* at 13-15.)  Conerly Corp. still has a claims against Carroll
for intentional misrepresentation and against AmSouth/Regions for
breach of contract, bad faith breach of contract, negligence and
negligent misrepresentation, detrimental reliance, and
intentional misrepresentation.  On July 2, 2009, the Court
granted ICSOP's unopposed motion to dismiss its claims against
defendants without prejudice.  (R. Doc. 57.)  Conerly Corp. is
thus the only remaining plaintiff in this action.

 After obtaining its dismissal from this action, ICSOP filed
a separate action before Judge Feldman seeking indemnity from

Jessie and Mary Conerly as individuals.[2] *See Ins. Co. of the State of Penn. v. Jessie L. Conerly and Mary F. Conerly*, Civ. A. No. 09-4452 (Feldman, J.). This action was transferred to this Court on October 1, 2009. (Civ. A. No. 09-4452, R. Doc. 20.) In ICSOP's indemnity action, ICSOP alleges, *inter alia*, that "Conerly assigned any and all claims arising out of the Project work, including but not limited to, any and all claims against Beechgrove Redevelopment . . . and agreed to allow ICSOP to prosecute any such matters in its own name (this would include insurance claims)." (Civ. A. No. 09-4452, R. Doc. 1 ¶ 16.)

Defendants now move to dismiss Conerly's Corp.'s action on grounds that Conerly Corp. lacks standing to sue on contract claims arising from the Beechgrove development. According to defendants, Conerly Corp. has fully assigned its contract claims to ICSOP, and therefore ICSOP is the only real party in interest. Alternatively, defendants argue that Conerly Corp. partially assigned its claims to ICSOP, and therefore ICSOP is a necessary party that is not joined in this action.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits

_____

[2] It is unclear why ICSOP filed a separate action against Jessie and Mary Conerly and not a cross-claim in this action.

show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Although all reasonable inferences are drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Moreover, Rule 56 does not "impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (same), *cert. denied*, 513 U.S. 871 (1994).

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075.

**B.  Contract Interpretation**

In *Doré Energy Corp. v. Prospective Inv. & Trading Co., Ltd.*, the Fifth Circuit recently discussed the principles governing the interpretation of contracts under Louisiana law. 570 F.3d 219, 225 (5th Cir. 2009).  The issue of the ambiguity, *vel non*, of a contract is a legal question.  *Id.*  If the contract is not ambiguous, then interpreting it is also a legal issue for the court.  *Id.*  A court may consider extrinsic evidence as to the parties' intent only if the contract is ambiguous.  *See, e.g.*, *Campbell v. Melton*, 817 So.2d 69, 75 (La. 2002).  A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed. *Id.* (citing La. Civ. Code § 1848).  As in *Doré Energy,* the Court finds further guidance in contract interpretation from the following articles of the Louisiana Civil Code:

Art. 2045. Determination of the intent of the parties: Interpretation of a contract is the determination of the common intent of the parties.

Art. 2046.  No further interpretation when intent is clear: When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in

search of the parties' intent.

Art. 2047. Meaning of words:  The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.

Art. 2048. Words susceptible of different meanings:  Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract.

Art. 2049. Provision susceptible of different meanings:  A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.

Art. 2050. Provisions interpreted in light of each other:  Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.

Art. 2053.  Nature of contract, equity, usages, conduct of the parties, and other contracts between same parties:  A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.

The Court will follow the interpretive guidance propounded by the Fifth Circuit and Louisiana law.

## III. ANALYSIS

### A.   Validity of Assignment

Defendants argue that Conerly Corp. is not the real party in interest in this action because it has fully assigned to ICSOP its contracts in connection with Beechgrove redevelopment – including its alleged oral contract with Carroll.  Defendants argue that this assignment was effected by both the 2001 General Indemnity Agreement and the 2004 Financing Agreement.

Under the Federal Rules of Civil Procedure, "[e]very action shall be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a).  "The 'real party in interest' is the party who, by substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *New Orleans Public Service v. United Gas Pipe Line*, 732 F.2d 452, 464 (5th Cir. 1984), *cert. denied*, 469 U.S. 1019 (1984); *see also* 6A Wright, Miller & Kane, *Fed. Prac. & Proc.* § 1543 (2d ed. 2009).  "A federal court sitting in diversity must look to state law to determine which party holds the substantive right." *Farrell Constr. Co. v. Jefferson Parish, Louisiana*, 896 F.2d 136, 140 (5th Cir. 1990).  Thus, to determine the real party in interest in this action, it is necessary to determine which party "holds the substantive right sought to be enforced" as a matter of Louisiana law.  *Id.*  This in turn requires determining both whether Louisiana law recognizes the

assignment of the rights being sued on in this case, and whether
the assignment was in fact made.

1.  Assignment of Legal Claims Under Louisiana law

In Louisiana, "[a]ll rights may be assigned, with the
exception of those pertaining to obligations that are strictly
personal.  The assignee is subrogated to the rights of the
assignor against the debtor."  La. Civ. Code. art. 2642; *cf.* La.
Civ. Code art. 2448 ("All things corporeal or incorporeal,
susceptible of ownership may be the object of a contract of sale
. . .").  This means that the assignee "steps into the shoes" of
the assignor and acquires only those rights possessed by the
assignor at the time of the assignment.  *See, e.g.*, *Pontchartrain
Gardens, Inc. v. State Farm Gen. Ins. Co.*, Civ. A. No. 07-7965,
2009 WL 86671, at *3-5 (E.D. La. Jan. 13 2009) (Vance, J.); *AAR,
Inc. v. Century Inv. Group, LLC*, Civ. A. Nos. 08-0007, 08-4194,
2009 WL 1455325, at *3 (E.D. La. May 22, 2009).  In short,
Conerly Corp. may assign any rights that it had at the time of
the assignment as long as they are not "strictly personal," or
the assignment is not otherwise proscribed by law.  *See, e.g.*,
*Pontchartrain,* 2009 WL 86671, at *3-5; *Steirwald v. Phoenix Ins.
Co.*, Civ. A. No. 00-3256, 2001 WL 617542, at *3 (E.D. La. May 30,
2001) (Duval, J.).

A "strictly personal" obligation is one that "can be
enforced only by the obligee, or only against the obligor."  La.

Civ. Code art. 1766. Strictly personal obligations typically involve special skills or qualifications. *See id.* "All obligations to perform personal services are presumed to be strictly personal on the part of the obligor." *Id.* A construction contract to perform work is a strictly personal obligation with respect to the obligor. *See* La. Civ. Code art. 2766 (work contract canceled by death of worker, unless proprietor consents to continued work by heirs); *see also* 5 La. Civ. Law Treatise § 4.12. The right to receive compensation for work already performed under a construction contract, however, is not strictly personal. *See* La. Civ. Code art. 2767 (following death of worker, owner bound to pay heirs of worker value of work already performed). As stated in a respected civil law treatise on Louisiana law, a "building contract is a bilateral one where the builder's obligation, though strictly personal on his part, is correlative of the owner's obligation to pay for the job. That latter obligation, of which the builder is the obligee, is inheritable on both sides and can therefore be enforced by successors of the obligee, as it could be enforced against successors of the obligor." 5 La. Civ. Law Treatise § 4.12. Thus, although Conerly Corp.'s obligation to provide construction services to defendants may be "strictly personal," its contractual right to collect payment for those services is not. *See Keith v. Comco Ins. Co.*, 574 So.2d 1270, 1276 (La. App. Ct.

1991).

The Court observes that Conerly Corp.'s claim for bad faith breach of contract sounds in contract and not tort because Carroll's alleged duty to Conerly Corp. arose from the contractual relationship itself. *See Meredith v. Louisiana Fed. of Teachers*, 209 F.3d 398, 407 (5th Cir. 2000) ("A bad faith breach of contract may sound in tort or contract, depending on whether the duty breached is one owed to all persons or to only to those having rights under the contract. If the duty is owed only to those with contractual rights, a claim for its breach is a contract action."). It cannot be said that, apart from his alleged breach of an oral promise, Carroll's conduct was "wrongful, illegal or amounted in law to an offense or quasioffense." *Billeaud Planters, Inc. v. Union Oil Co. of Cal.*, 245 F.2d 14, 19 (5th Cir. 1957). Accordingly, Conerly Corp.'s claim for bad faith breach of contract is assignable along with its other contract rights. *See In re Katrina Canal Breaches Consol. Litig.*, 601 F. Supp. 2d 809, 822 n.9 (E.D. La. 2009) (observing that in majority of American jurisdictions, bad faith as well as claims for punitive damages, counsel fees and interest are assignable); *Pontchartrain Gardens*, 2009 WL 86671, at *4-5 (bad faith claims may be assigned). The Court finds no authority for Conerly Corp.'s argument that a contract action is not assignable simply because it may entail consequential damages,

and that argument is rejected.

Although Conerly Corp. may assign its contractual rights to payment, it is a somewhat more complicated question whether it may also assign its tort claims against Carroll and AmSouth/Regions. It is true that the Louisiana Supreme Court has stated that "a victim's action for recovery of tort damages is not strictly personal." *Nathan v. Touro Infirmary*, 512 So.2d 352, 354 (La. 1987); *see also Guidry v. Theriot*, 377 So.2d 319, 323 (La. 1979) (same), *abrogated on other grounds*, *Louviere v. Shell Oil Co.*, 440 So.2d 93 (La. 1983). Thus, a pending medical malpractice action transfers to a victim's heirs at death. *Id*. This does not mean, however, that inchoate causes of action in tort may be assigned *inter vivos*.

In *Taylor v. Babin*, a case involving the *inter vivos* assignment of a legal malpractice claim, the Louisiana Court of Appeals distinguished *Nathan* and *Guidry*:

> [*Nathan and Guidry*] involved the inheritability – not the assignability - of medical malpractice actions by a designated beneficiary, after the commencement of an action by the plaintiff tort victim through the filing of a suit or pre-suit complaint. In both cases, the [Louisiana] [S]upreme [C]ourt emphasized the fact that the patients had asserted their rights to recover by filing a claim prior to death, thus creating property rights that were inheritable.

13 So.3d 633, 637 (La. App. Ct. 2009). *Taylor* ultimately held that an inchoate legal malpractice action is not assignable *inter vivos* under article 2642 of the Civil Code. *See* 13 So.3d at 637.

The Court finds *Taylor*'s reasoning sound. First, as *Taylor*

14

suggested, *Nathan* and *Guidry* are based on specific Code provisions dealing with the passage of rights at death that are not directly applicable to this case. *See* La. Code Civ. P. art. 426 ("An action to enforce an obligation is the property of the obligee which on his death is transmitted with his estate to his heirs . . . These rules apply also to a right to enforce an obligation, when no action thereon was commenced prior to the obligee's death."); *id.* art. 428 ("An action does not abate on the death of a party. The only exception to this rule is an action to enforce a right or obligation which is strictly personal."); *id.* art. 801 ("When a party dies during the pendency of an action which is not extinguished by his death, his legal successor may have himself substituted for the deceased party . . ."). The transfer of tort actions at death is governed by specific provisions of Louisiana law; there are no analogous Code provisions expressly permitting the *inter vivos* assignment of such actions.

Moreover, to the extent articles 426, 428 and 801 suggest the possibility that tort actions may be assigned *inter vivos*, they do not address when such actions are "strictly personal," and hence when they may be assigned under La. Civ. Code. art. 2642. Indeed, article 426 begs that very question. *See* La. Code Civ. P. art 426 (actions abate at death if they are "strictly personal"). In *Nathan*, the Louisiana Supreme Court indicated

that what makes a tort action not "strictly personal" is that it was actually commenced by the tort victim. By initiating suit, the victim "creat[s] a property right which is heritable." *Nathan*, 512 So.2d at 355 ("because Herbert Nathan instituted this action and asserted his claim before his death, his 'right' of action has been transformed into an 'action'"); *see also King v. Illinois Nat. Ins. Co.*, 986 So.2d 839, 842 (La. Ct. App. 2008) ("A cause of action on which suit has not yet been filed is strictly personal and not transferable."). In short, "there is a significant difference between inheriting an instituted action and inheriting the right to institute an action." *Nathan*, 512 So.2d at 355; *see also Guidry*, 377 So.2d at 324.

The Fifth Circuit too has distinguished between "already-filed" tort actions and inchoate tort actions in the context of *inter vivos* assignments. In *Woodfield v. Bowman*, the victim of a car accident filed suit against other drivers, their insurers, and her own insurer (Nationwide). 193 F.3d 354, 357-58 (1999). The plaintiff settled with the other drivers and assigned her claim against Nationwide to one of the defendant insurers (Planet). Planet then filed a third-party complaint against Nationwide. A jury verdict was ultimately issued against Nationwide, which then appealed the validity of the assignment to Planet. The court, citing *Nathan*, *Guidry*, and Civil Code articles 2642 and 2652, upheld the validity of the assignment.

Under Louisiana law, "rights in an "*already-filed* personal injury suit" are not "strictly personal" and thus are "freely assignable." *Id.* at 359, 359 nn.8-9. The court "confirmed [its] recognition," however, "of the Louisiana Supreme Court's distinction between a personal injury claim that is the subject of an extant lawsuit, which is heritable and assignable, and a claim that is merely an inchoate personal injury cause of action that has not yet been sued on, which is strictly personal and not heritable or assignable." *Woodfield*, 193 F.3d at 360; *see also Gilboy v. Am. Tobacco Co.*, 540 So.2d 391, 393 (La. App. Ct. 1989) (inchoate personal injury claim may not be donated during victim's lifetime).

The Court recognizes a potential distinction between the assignment of personal injury tort claims and *commercial* tort claims. But the distinction goes nowhere in this case. As a preliminary matter, Louisiana has not adopted U.C.C. Section 9-102, which defines a "commercial tort claim." *See* La. Rev. Stat. § 10:9-102(a)(13) ("[Reserved.]"). This reservation suggests that commercial tort claims are treated no differently than all other tort claims. As already discussed, inchoate tort claims may not be assigned in Louisiana.

Even if the Louisiana U.C.C. did treat commercial torts separately, this would not change the result in this case. The comments to U.C.C. Section 9-102 clarify that "[a]lthough

security interests in commercial tort claims are within its scope, this [U.C.C.] Article [9] *does not override other applicable law* restricting the assignability of a tort claim." La. Rev. Stat. § 10:9-102, Uniform Commercial Code Comment 5(g) (emphasis added). Again, under Louisiana law a tort claim may be assigned only after it has been filed by the tort victim. Because Conerly Corp.'s tort claims against Carroll and AmSouth/Regions were not filed until 2007, the 2001 General Indemnity Agreement and the 2004 Financing Agreement could not have assigned those claims, and the Louisiana U.C.C. does not override this conclusion.

Other provisions of the Louisiana U.C.C. confirm that inchoate tort claims may not be assigned or collateralized. "In order for a security interest in a tort claim to attach, the claim must be in existence *when the security agreement is authenticated*." La. Rev. Stat. § 10:9-204, Uniform Commercial Code Comment 4 (2002) (emphasis added); *see also* La. Rev. Stat. § 10:9-204(b)(2). "It follows that when an effective security agreement covering a commercial tort claim is entered into *the claim already will exist*." La. Rev. Stat. § 10:9-108, Uniform Commercial Code Comment 5 (2002) (emphasis added) (citing La. Rev. Stat. § 10:9-204). Accordingly, the Louisiana U.C.C. is entirely consistent with the Louisiana Supreme Court's clear admonition that "there is a significant difference between

18

inheriting an instituted action and inheriting the right to institute an action." *Nathan*, 512 So.2d at 355; *see also Guidry*, 377 So.2d at 324. The latter is an unassignable "strictly personal" obligation. Again, Conerly Corp.'s tort claims were not filed until well after the General Indemnity Agreement and Financing Agreement were executed, and accordingly they could not have been assigned by those agreements.

Even if Conerly Corp.'s inchoate tort claims for intentional and negligent misrepresentation could have been assigned, the Court finds that they were not properly assigned in this case. The Louisiana U.C.C. provides that "a description only by type of collateral" is insufficient to create a security interest in a commercial tort claim. La. Rev. Stat. § 10:9-108(e)(1). The assignment "must describe the tort claim with greater specificity than simply 'all tort claims.'" La. Rev. Stat. § 10:9-204, Uniform Commercial Code Comment 4. Specificity is required "in order to prevent debtors from inadvertently encumbering" their tort claims. La. Rev. Stat. § 10:9-108(e)(1), Uniform Commercial Code Comment 5. In this case, neither the General Indemnity Agreement nor the Financing Agreement makes any specific reference to Conerly Corp.'s tort claims against Carroll or AmSouth/Regions. The General Indemnity agreement purports to collateralize Conerly Corp.'s "contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds." (*See*

19

R. Doc. 60, Ex. B at 2.)  It also purports to collateralize "any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest."  (*Id.*)  The Financing Agreement purports to assign "any and all claims arising out of the Project work."  (*See* R. Doc. 60, Ex. D ¶ 11.)  Yet neither agreement mentions Conerly Corp.'s tort claims, let alone with any degree of detail.  *See In re Zych*, 379 B.R. 857, 864 (Bankr. D. Minn. 2007) (lender "precluded from claiming a security interest in the proceeds of [borrower]'s commercial tort claim because [lender]'s security agreement did not identify any such collateral by detailed 'type' description or otherwise, and because the claim arose after the effective date of [lender]'s security agreement.").  Because the General Indemnity Agreement and the Financing Agreement do not identify any of Conerly Corp.'s tort claims, they did not assign those claims.

The Court further finds that the torts in this case were not assigned as "proceeds" of other assigned rights or collateral. U.C.C. § 1-109(d)(12) recognizes "security interests in tort claims that constitute proceeds of other collateral (*e.g.*, a right to payment for negligent destruction of the debtor's inventory".)).  La. Rev. Stat. § 10:9-109, Uniform Commercial Code Comment 15.  Louisiana notably has *not* adopted § 1-

109(d)(12).  *See* La. Rev. Stat. § 10:9-109(d)(12)

("[Reserved.]").  That Louisiana has reserved this section

suggests that tort claims may not be bootstrapped as mere

proceeds of other assigned contract rights.  This interpretation

is consistent with the clear requirements of §§ 10:9-108 and

10:9-204, which permit the assignment of tort claims only when

they are specifically identified and already in existence.  *See*

*In re Zych*, 379 B.R. at 862-64.  It is also consistent with

established Fifth Circuit and Louisiana state court precedent.

    In any event, even if Louisiana did permit torts to be

assigned as proceeds of other collateral, the torts in this case

are not "proceeds" of Conerly Corp.'s alleged oral contract with

Carroll.  "Proceeds" include, *inter alia*, "claims arising out of

the loss, nonconformity, or interference with the use of, defects

or infringement of rights in, or damage to, the collateral."  La.

Rev. Stat. 10:9-102(64)(D).  Here, although Carroll's breach of

contract may have impaired ICSOP's rights in collateral (*i.e.*,

the oral contract), Carroll's alleged unlawful misrepresentations

to Conerly Corp. did not.  As suggested by the comments to §

10:9-109, a tort action for negligent destruction of inventory

may be necessary to preserve a secured party's interest in

assigned inventory.  *See* La. Rev. Stat. § 10:9-109, Uniform

Commercial Code Comment 15.  But a tort action for negligent or

intentional misrepresentation is not necessary to preserve a

secured party's interest in an assigned contract.  ICSOP may fully vindicate its rights under the allegedly assigned oral contract with Carroll regardless of whether it may also bring a tort action for negligent or intentional misrepresentation. Accordingly, Conerly Corp.'s misrepresentation claims were not assigned as proceeds of the oral contract.

As already thoroughly discussed, in Louisiana a tort claim may be assigned only if it is specifically identified and in existence at the time of the assignment.  Neither condition holds in this case.  Accordingly, Conerly Corp.'s tort claims have not been assigned to ICSOP, and defendants' motion must be DENIED with respect to those claims.

2.  <u>The Financing Agreement</u>

The next issue is whether Conerly Corp. assigned to ICSOP its rights under the alleged oral contract with Carroll.  If it did, then ICSOP is a real party in interest with respect to Conerly Corp.'s contract claims.

As a preliminary matter, there is a distinction to be drawn between an assignment of an asset, and the offering of security to be held until a loan is paid.  *See BG Wire Rope & Slings, Inc. v. Dyson*, 884 So.2d 688, 691 (La. App. Ct. 2004).  The former "transfers title of the asset to the assignee, who then has the immediate right, upon signing of the agreement, to pursue payment of the loan from the assigned asset." *Id.*  With the latter, "the

creditor must wait until the debtor defaults on the loan before the asset may be used for payment." *Id.; see also Mahayna, Inc. v. Poydras Center Assoc.*, 693 So.2d 355, 358-59 (1997) ("The defining difference between a pledge and an assignment of ownership is the transferee's immediate right in this case to pursue and collect judgment proceeds contemporaneously with the signing of the agreement."), *writ denied*, 703 So.2d 619 (1999). "[N]o special forms or words are required to constitute a valid assignment, nor does the transfer have to be in writing." *Katz v. Saruessen*, 476 So.2d 16, 19 (La. Ct. App. 1985); *Producing Manager's Co., Inc. v. Broadway theater League of New Orleans, Inc.*, 288 So.2d 676, 679 (La. Ct. App. 1974) (same). On the other hand "use of particular terms within an agreement, such as 'additional security' or pledge, does not alone characterize the agreement or invalidate a finding that the agreement was an assignment." *BG Wire*, 884 So.2d at 691.

Defendants have apparently conceded that the General Indemnity Agreement created a mere security interest in the oral contract with Carroll. (*See* R. Doc. 73 at 1 ("Regions and Carroll agree with Conerly Corp. that the language in the General Indemnity Agreement supports the granting of a security interest").) The Court need not address the General Indemnity Agreement, however, because it finds that the Financing Agreement effected an assignment of Conerly Corp.'s rights under the

contract.

The Court finds that the Financing Agreement expresses a clear intent to assign Conerly Corp.'s contract rights in connection with the Beechgrove redevelopment to ICSOP. The Financing Agreement expressly provides that Conerly Corp. "hereby assigns to Surety [ICSOP] any and all claims arising out of the [Beechgrove] Project work . . . This assignment includes the right to prosecute the claims in the name of the Conerly or Surety, at Surety's sole option, should Conerly fail or refuse to prosecute said claims." (*Id.* ¶ 11.) It also provides that Conerly Corp. will "authorize and demand the Owner [Beechgrove] to pay the monies earned on the Project to Surety [ICSOP] which Surety shall then use to offset and/or collateralize the debts owned or to be owed by Conerly to the Surety." (R. Doc. 60, Ex. D ¶ 10.) It is not disputed that Carroll's alleged oral promise to compensate Conerly Corp. for continued work on the project would constitute "monies earned on the Project." Moreover, Conerly Corp. alleges that its oral contract with Carroll and AmSouth/Regions arose as of at least June 25, 2004 - approximately three and one-half months before the Financing Agreement was executed on October 12, 2004. (*See* R. Doc. 39 ¶ 12(b).) Thus, the Financing Agreement unambiguously assigned to ICSOP the right to collect "any and all" payments due to Conerly Corp. on the Beechgrove project, including under the alleged oral

24

contract with Carroll.

The Court also finds that the assignment of the right to prosecute Conerly Corp.'s contract claims was effective immediately and not intended as mere security contingent on a subsequent default. ICSOP could initiate suit "at [ICSOP]'s sole option." (R. Doc. 60, Ex. D ¶ 11.) Indeed, Conerly Corp. *already* had defaulted. (*See* R. Doc. 60, Ex. C.) The Court does not read the second sentence of paragraph 11 as conditioning when ICSOP's right to prosecute arises.[3] Rather, the second sentence - prefaced by the word "includes" - simply clarifies that ICSOP may prosecute Conerly Corp.'s claims *even if* Conerly Corp. fails to do so.

The Court recognizes that the Financing Agreement states that ICSOP may apply monies received from the project "to offset and/or *collateralize* the debts owed by Conerly to [ICSOP]." (R. Doc. 60, Ex. D ¶ 10 (emphasis added).) Conerly Corp. also points out that the Financing Agreement contemplates the filing of a UCC-1 financing statement. (*See* R. Doc. 60, Ex. D ¶ 4.) According to Conerly Corp., the references to collateralization and a UCC-1 financing statement raise an ambiguity as to whether the parties intended to create a mere security interest. The

---

[3] The second sentence of paragraph 11 provides that "This assignment includes the right to prosecute the claims in the name of the Conerly or Surety, at Surety's sole option, should Conerly fail or refuse to prosecute said claims." (*See* R. Doc. 60, Ex. D ¶ 11.)

Court disagrees.  Paragraph 10 of the Financing Agreement also permits ICSOP to use monies received to "offset" Conerly Corp.'s debts.  The term "offset" implies immediate assignment and not mere security contingent on a subsequent default.  Moreover, Conerly Corp.'s UCC-1 financing statement vaguely covers "Fixtures, Assets, proceeds, after-acquired property, equipment and accounts."  (*See* R. Doc. 60, Ex. D.)  It is far from clear that this language even covers ICSOP's right to collect on Conerly Corp.'s contract claims.  In any event, the mere filing of a UCC-1 statement has no legal effect on whether a transfer is in fact a security interest as opposed to an assignment.  *See BG Wire*, 884 So.2d at 691.

Conerly Corp. relies on *Ring Constr. v. Chateau Des Lions, LLC*, 918 So.2d 1172 (2006).  In *Ring*, during arbitration enforcement litigation, Ring granted to its insurance company its arbitration award against the defendant as "a security interest" for several liens pending on another construction project.  The transfer agreement with the insurance company provided that "In the event of the declaration by Hartford [the insurance company] that Ring is in default of any of its obligations . . . Hartford is given full and irrevocable authority to collect the [arbitration award] and to hold the amounts collected as collateral for the obligations of Ring to Hartford, provided that . . . the balance of any collateral remaining after Hartford has

reimbursed itself for all liability, losses and expenses shall be returned to Ring." *Id.* at 1174. After the defendant learned of the agreement, it claimed that Ring had assigned the arbitration award to Hanover and therefore lacked standing to pursue the action. The court disagreed, holding that the transfer of the arbitration agreement effected a mere security interest as opposed to an assignment, and therefore Ring was not deprived of standing. *Id.* at 1174-75.

*Ring* is distinguishable on its facts. The agreement in *Ring* did not contemplate the immediate exercise of rights by the assignee. Instead, the assignee's rights to enforce the arbitration agreement were contingent on a declaration of default. *Id.* at 1174 ("***Execution***. In the event of the declaration by Hartford that Ring is in default of any of its obligations . . ."). Thus, *Ring* involved collateral that could not be collected unless and until the assignor defaulted.[4] In this case, however, there is no such contingency. As already discussed, the Financing Agreement provides that Conerly Corp. "*shall* authorize and demand the Owner to pay the monies earned on the Project to Surety" and "*hereby assigns* to Surety any and all claims arising out of the Project work." (R. Doc. 60, Ex. D ¶ 10.) It also provides that ICSOP may affirmatively "use" monies

_____

[4] *Ring* does not indicate whether there was a declaration of default in the case, but in any event this fact would not alter the interpretation of the agreement itself.

27

recovered to "offset" (and not merely collateralize) debts owed.
(R. Doc. 60, Ex. D ¶ 10.)  This language indicates actual
assignment, and not mere security contingent on future events.
Despite certain similarities between this case and *Ring*, the
court finds that Conerly Corp. intended to assign its contract
rights to ICSOP.

**B.   Scope of Assignment**

That Conerly Corp. assigned contract rights to ICSOP does
not resolve the scope of that assignment.  A distinction must be
made between full and partial assignments.  Under Louisiana law,
when an incorporeal right is fully assigned, it is enforceable by
only the assignee.  La. Code Civ. P. 698(2).  When an incorporeal
right is partially assigned, however, it is enforceable by both
the assignor and assignee.[5] La. Code Civ. P. 698(1); *see also*
*Soileau v. LaFosse*, 558 So.2d 294, 296-97 (La. Ct. App. 1990).

From the terms of the Financing Agreement, the Court finds
that the parties intended to assign Conerly Corp.'s rights only
to the extent of Conerly Corp.'s debt to ICSOP.  Paragraph ten of
the Financing Agreement provides that ICSOP "shall have no
obligation to return any monies it may receive from the Owner to
Conerly *unless and until all of the loss, cost, expense and fees,*

_____

[5] The Court looks to substantive Louisiana law in order to
determine the real parties in interest in this case.  *Farrell*,
896 F.2d at 140 ("A federal court sitting in diversity must look
to state law to determine which party holds the substantive
right.").

*including attorney's fees, incurred by [ICSOP] are paid in full.*"
(R. Doc. 60, Ex. D, ¶ 10.)  Thus, although the immediate right to
receive and enforce contract payments was assigned to ICSOP,
Conerly Corp. retains an interest in those payments to the extent
they exceed its debt to ICSOP.  This is consistent with Louisiana
law.  *See* La. Civil Code art. 3052 (surety may recover only
amounts paid to creditors); *see also United States Fid. & Guar.
Co. v. Worthington & Co.*, 6 F.2d 502, 503 (5th Cir. 1925) (after
surety indemnified itself against loss, "there remained the duty
to plaintiff to refund the difference, if any, and there was an
implied promise to that effect").  Because Conerly Corp. retains
a residual interest in the assigned contract rights, the
assignment was only partial and Conerly remains a party in
interest.

The Court recognizes that Conerly Corp.'s letter of
voluntary default states that Conerly Corp. "waive[s] any and all
rights we now have or might acquire in the future to all
contracts balances and retainage on this project."[6] (R. Doc. 60,
Ex. C.)  The Court finds, however, that the letter was intended
only to enable ICSOP to begin collecting contract balances owed
to Conerly Corp. by third parties.  (*See* R. Doc. 60, Ex. D ¶ 3
("Surety shall have the right to use" the letter).)  It was

---

[6] The Court may consider the letter of voluntary default
because it is incorporated as an exhibit to the Financing
Agreement.  (*See* R. Doc. 60, Ex. D ¶ 3.)

strongly worded to remove doubt that the balances could be paid directly to ICSOP and not Conerly Corp. But the letter was not intended to define the scope of the assignment of those balances. As already discussed, the scope of the assignment is defined in paragraph 10 of the Financing Agreement, which limits ICSOP's recovery to its "loss, cost, expense and fees, including attorney's fees." (R. Doc. 60, Ex. D ¶ 10.) Therefore, because Conerly Corp. retains a residual interest in the value of its contract claims against defendants, it is a real party in interest and defendants' motion must be DENIED.

## C. ICSOP Is a Necessary Party

Having determined that the oral contract with Carroll was partially assigned to ICSOP, it must finally be determined whether ICSOP is a necessary party to this action. "On motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Proper joinder of a necessary party under the Federal Rules is a two step process. First, the court must decide if the absent party is a necessary party to the action. *See* Fed. R. Civ. P. 19(a). Second, if the absent party is a necessary party, but its joinder is not feasible, the court must decide whether the absent party is an "indispensable" party to the action. *See* Fed. R. Civ. P. 19(b).

A party is necessary if it "claims an interest relating to the subject of the action and is so situated that disposing of

the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i).  If a required party is not joined, the "court must order that the person be made a party." Fed. R. Civ. P. 19(a)(2).

ICSOP is a necessary party to this action.  ICSOP was an original plaintiff in this action, and it has a partial interest in the alleged contract from which this action arises.  The Court's resolution of this action could adversely affect ICSOP's interest in the alleged contract.  Defendants argue, in the alternative, that ICSOP is a necessary party and give no reason why ICSOP should not be joined.  For its part, Conerly Corp. argues, in the alternative, that its assignment of rights to ICSOP was partial and gives no reason why ICSOP should not be joined.  Under Louisiana law, when an incorporeal right is partially assigned, it must be enforced by both the assignor and assignee.[7]  La. Code Civ. P. 698(1); *see also Soileau*, 558 So.2d

_____

[7] The Court looks to substantive Louisiana law in order to determine the real parties in interest in this case.  "The 'real party in interest' is the party who, by substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *New Orleans Public Service v. United Gas Pipe Line*, 732 F.2d 452, 464 (5th Cir. 1984), *cert. denied*, 469 U.S. 1019 (1984); *see also* 6A Wright, Miller & Kane, *Fed. Prac. & Proc.* § 1543 (2d ed. 2009). "A federal court sitting in diversity must look to state law to determine which party holds the substantive right." *Farrell Constr. Co. v. Jefferson Parish, Louisiana*, 896 F.2d 136, 140 (5th Cir. 1990).

at 296-97.  Moreover, the Court sees no reason why joinder of ICSOP would not be feasible.  ICSOP was previously a party to this action, and it has a separate, related action pending in the Eastern District of Louisiana.  Although ICSOP was previously dismissed without prejudice from this action on its own unopposed motion, the Court concludes that ICSOP is a necessary party.  Accordingly, plaintiffs are ordered to timely join ICSOP in this action as a necessary party in accordance with Federal Rule of Civil Procedure 19.

## IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is DENIED.  Plaintiffs are ordered to join ICSOP as a necessary party within 15 days from the filing of this order.

New Orleans, Louisiana, this 21st day of October 2009

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE